FILED - KZ
January 19, 2021 4:24 PM
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
ems  Scanned by mg 1/20/21

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

JENNIFER J. REINOEHL            )
PLAINTIFF                       )
v.                              )

**GOVERNOR GRETCHEN WHITMER,)**

**ROBERT GORDON,**              )

and **YOUNG MEN'S CHRISTIAN**    )
**ASSOCIATION OF GREATER**       )
**MICHIANA, INC.**               )
DEFENDANTS                      )

**1:21-cv-61**

Janet T. Neff - U.S. District Judge
Phillip J. Green  - U.S. Magistrate Judge

Cause No. _____

**NON-JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES AND PERMANENT INJUNCTION

Now comes JENNIFER J. REINOEHL (herein referred to as "Plaintiff"), on behalf of

herself, pro se, and respectfully brings this Complaint for Damages and Permanent Injunction,

against Defendants Governor Gretchen Whitmer, Robert Gordon, and the Young Men's

Christian Association of Greater Michiana, Inc. (herein also referred to as "YMCA" or "YMCA

of Greater Michiana") collectively referred to herein as "Defendants."

## I.    PARTIES TO THE COMPLAINT

**A. The Plaintiff**

1.      Jennifer J. Reinoehl resides at 51860 Cheryl Dr., Granger, St. Joseph County, IN, 46530

with phone number: 574-302-6088.

**B. The Defendants**

2.      Governor Gretchen Whitmer is the acting governor of the State of Michigan and resides

at 2520 Oxford Rd, Lansing, MI, 48911 and is being sued in her individual capacity.

3.      Robert Gordon is the acting Director of the Michigan Department of Health and Human Services (herein referred to as "MDHHS") and resides at 3687 Beech Tree Lane, Okemos, MI, 48864 and is being sued in his individual capacity.

4.      The Young Men's Christian Association of Greater Michiana, Inc. is a non-profit health-based organization doing business at 905 North Front Street, Niles, MI, 49120. Mark Weber is its registered agent and according to public record is accessible at the same address.

## II.      BASIS FOR JURISDICTION AND VENUE

5.      The U.S. District Court for the Western District of Michigan has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides Federal Courts have jurisdiction over cases involving a federal question—U.S. Constitutional Rights granted under the 1st, 4th, 5th, and 14th Amendments and Rights bestowed by the Federal American Disabilities Act are in question.

6.      In addition, 28 U.S.C. § 1332 provides Federal Courts have jurisdiction over cases in which a citizen of one State sues a citizen of another State and the amount at stake is more than $75,000—the Plaintiff is a resident of the State of Indiana and the Defendants reside or primarily operate in Michigan. More than $75,000 is at stake because the Plaintiff's Rights and the pain and suffering caused when the Plaintiff was given the choice of putting her life at risk or being denied access to the YMCA of Greater Michiana combined with the pain and suffering from the humiliation she suffered when her Rights were denied and the pain and suffering from the missed developmental moments with her child are worth far more than $75,000, and in fact are so valuable that no monetary amount would ever fully compensate her loss. These facts also make this a diversity of citizenship case.

7.     Title 42§ 1983, the U.S. Constitution, 14th Amendment §5, and *Ex parte Young*, 209 U.S. 123 (1908), allow lawsuits to be brought against persons in government employ when those officials act under the color of law but act independent of Federal and State Laws. Governor Gretchen Whitmer and Robert Gordon are granted lawful authority to enact orders during public emergencies but have abused Federal and State Laws through the orders they have enacted and the posts they have allowed on State websites.

8.      The court has personal jurisdiction over the Defendants because they are all situated in Western Michigan with (2) being situated in Lansing and (1) situated in Berrien County, MI.

9.      Venue is proper because the events and omissions giving rise to the allegations in this complaint occurred in Berrien County, MI, where (1) of the Defendants is situated (28 U.S. Code § 1391).

## III.    STATEMENTS OF FACTS

10.     Plaintiff resides in the unincorporated community of Granger, St. Joseph County, IN. The Plaintiff, like the rest of the citizens of the United States, has been adversely affected by COVID-19.

### A. Historical Scientific Background

11.     Prior to the acceptance of Germ Theory—the modern theory of disease transmission—Miasma Theory was the accepted theory of disease transmission. (Exhibit 1)

12.     Miasma Theory was the belief that "bad air," specifically bad smelling air, caused disease. Miasma Theory adherents believed that the smell of rotting fish or the smell of an unbathed person would cause smallpox or other diseases. Most of their methods of preventing disease transmission focused on avoiding bad smells. (Exhibit 1)

4

13.     The 1600's plague mask with its long "beak" was designed with Miasma Theory in mind—the "beak" was actually a potpourri holder to keep bad smells from reaching the nose. At the same time, the overall look of a plague doctor's outfit resembled that of a raven, a creature which has powerful protective mythological ties for the British. These ties are so strong that today at least seven ravens are permanently kept with clipped wings on the Tower of London grounds allegedly for superstitious reasons.

14.     The plague mask's design bridged the fine line between medieval mysticism and science.

15.     By the 19th century, masks for public use that protected against Miasma had been patented, including but not limited to Lewis Haslett's 1849 "Lung Protector," which used charcoal to purify bad smells.

16.     Germ Theory, first proposed in A.D. 1546, had started to gain scientific momentum against Miasma Theory by the late 19th and early 20th century. (Exhibit 1)

17.     So strong was the hold of the Miasma Theory, cloth masks were introduced to surgical attire around the 1880s when the scientific works of Pasteur, Lister, and Koch strengthened Germ Theory and their methods and antiseptic procedures reduced deaths from infection after surgery.

18.     If the now disproven Miasma Theory had been correct, face masks would have prevented "bad air" from getting to the patient or the doctor. Once Germ Theory was widely accepted, face masks were justified as being able to block bacteria from the surgeon's mouth.

19.     Cloth face masks did not improve surgical outcomes over Lister's.

20.     No research was performed in regards to the safety or effectiveness of cloth masks prior to their addition to the surgical attire.

21.     In the more than 100 years since the introduction of cloth surgical masks, research has shown the ability of cloth masks and masks used by the general public to control disease transmission is scientifically controversial at best and ineffective at worst.

22.     In 1910 and 1911, pneumonic plague swept across Manchuria.

23.     Extensive experiments were performed on this droplet spread disease.

24.     In the *Report of the International Plague Conference* held at Mukden, April, 1911, scientists placed agar plates in close proximity to a plague patient's mouth as well as holding guinea pigs there, which are susceptible to the plague and concluded,

> "During normal and dyspnoeic respiration of primary pneumonic-plague cases, plague bacilli are not usually expelled by means of the expired air. During coughing of such cases, even when sputum visible to the naked eye is not expelled, plague bacilli in large numbers may become widely disseminated into the air surrounding the patient…The idea that infection of doctors, nurses, attendants, etc., in plague hospitals, is caused entirely by particles of sputum expectorated by the patient and visible to the naked eye, is erroneous."

The scientists recommended tight fitting cloth masks that were more than ½" thick to stop particles that could not be seen. (Exhibit 2)

25.     Only 1 out of 20 doctors who wore this mask at Fuchiatien died. (Exhibit 3)

26.     About 1 out of 5 nursing assistants (referred to as "Coolies" in the Exhibit), who were also responsible for burying the dead, died in Fuchiatien even though they were also wearing masks. (Exhibit 3)

27.     More than 1 out of 3 "ambulance parties" (drivers and attendants) died in Fuchiatien. (Exhibit 3)

28.     High death rates among some medical staff at Fuchiatien were attributed to wearing the mask improperly or inconsistently. (Exhibit 3)

29.     In Vol. VII, Sec. B, No. 3, of the Philippine Journal of Science (June, 1912), Barber and

Teague, in a variety of experiments that would be deemed unethical by today's standards, had

lab assistants hold a solution containing *Bacillus prodigiosus (Serratia marcescens)*, a bacteria

believed to be harmless to humans prior to the 1950s, in their mouths and then blow it out

through cloth masks (identical to the ones used in the Manchurian plague and recommended for

use in #24) to simulate sneezing and coughing, directing the airflow at Petri dishes. Although the

masks effectively stopped visible liquid droplets, *Bacillus prodigiosus (Serratia marcescens)*

were found on the petri dishes. The masks stopped visible droplets without stopping the bacteria.

(Exhibit 3)

30.     *Serratia marcescens* is 500-800 x 900-2000 nanometers (μm) in size. SARS-CoV-2, the

virus that causes COVID-19 is 60-140 nanometers(μm) in diameter. 168 of the largest SARS-

CoV-2 viruses could fit inside the smallest *Serratia marcescens.*

31.     The experiment summarized in #29 was one of several experiments performed by Barber

and Teague that brought into question the effectiveness of cloth face masks. (Exhibit 3)

32.     From 1915 to 1920, G.H. Weaver published a several papers defending the use of cloth

masks.

33.     Weaver's studies do not involve random controlled trials.

34.     In *Value of the Face Mask and Other Measures*, Weaver accredited masks of 2 layers of

cloth with reducing infection in Durand Hospital.

35.     In the later published, *Droplet Infection and Its Prevention by the Face Mask*, Weaver re-

examined his statements, after others had shown them to be wrong, and performed an experiment

that showed it took at least 6 layers of tightly woven cloth to stop a sufficient amount of bacteria.

He then recommended cloth masks be made from 3 layers of the same material. (Exhibit 4)

7

36.     Kellogg questioned Weaver's findings on cloth masks after San Francisco mandated masks during the Spanish Flu without any effect on the disease, so he performed a mechanical experiment where he used a machine to blow bacteria through different layers of cloth. He found it took (10) layers of cloth (noting this would cause breathing difficulties) in order to stop the bacteria. (Exhibit 5)

37.     All viruses are much smaller than bacteria.

38.     Major Capp, relying on Weaver's data, published *Measures for the Prevention and Control of Respiratory Infections in Military Camps*, August 10, 1918. In it, the measures he promoted after instituting them at Camp Grant included but were not limited to

> "every patient [upon arrival to the infirmary] with a contagious disease is masked immediately after the diagnosis is made."

These measures, he said, were

> "efficient in 95 per cent. [sic] of the exposures to scarlet fever and 100 per cent. [sic] of the exposures to the measles. If this experience can be taken as criterion, we soon shall be justified in ignoring the quarantine of the ward in these cross-infections, provided the system of masking and the cubicle is in good working order at the time of their appearance."

(Exhibit 6)

39.     The Spanish Flu arrived at Camp Grant September 21, 1918, six weeks after the paper discussing Major Capp's measures was published, and saw 70 hospital admissions that day. (Exhibit 7)

40.     Eight days later, September 29, 1918, there were 788 admissions. (Exhibit 7)

41.     In the end, Camp Grant had 10,713 cases of Spanish Influenza (about ¼ the population) and 1,060 deaths. Colonel Charles B. Hagadorn shot himself because so many of his men died. (Exhibit 7)

8

42.    In 1919, the Navy published the results of the extensive research they conducted during the Spanish Flu on prevention methods, including some random controlled trials of masks, the Secretary of the Navy stated in pertinent part,

> "First and last, all preventative measures which seemed logical, either from *a priori* reasoning or because of seemingly good effects claimed elsewhere during the year or previous epidemics, were tried in the Navy. These included quarantine, daily inspection of personnel and the taking of temperatures, early isolation of the sick, the wearing of face masks and gowns and rigid aseptic technic [sic] by attendants upon the sick…Not infrequently certain specific measures which were credited at one station with having prevented the spread of influenza or with having reduced the complications or with having kept case-fatality rates low failed to prove of any value at another station…In other words, each particular preventative measure failed in some instances to accomplish recognizable results."

> "The experience of 1918 would indicate that a very important preventative measure when confronted with an outbreak of influenza consists in rapidly enlarging existing medical and nursing facilities for the proper care and treatment of large numbers of persons who will inevitably be attacked regardless of the measures planned to prevent the occurrence or spread of the disease."

And

> "No evidence was presented which would justify compelling persons at large to wear masks during an epidemic. The mask is designed to only afford protection against a direct spray from the mouth of the carrier of pathogenic microorganisms; and assuming that it affords such protection, the probability that the microorganisms will eventually be carried into the mouth or nose by the fingers is very great if the mask is worn for more than a brief period of time. Masks of improper design, made of wide-mesh gauze, which rest against the mouth and nose, become wet with saliva, soiled with the fingers, and are changed infrequently, may lead to infection rather than prevent it especially when worn by persons who have not even a rudimentary knowledge of the modes of transmission of the causative agents of communicable diseases."

And finally,

> "At the United States Naval Training Station, Great Lakes, Ill., of 674 hospital corpsmen and volunteers of other ratings who were on duty caring for the sick during the epidemic, 96 wore gauze masks. The others did not. Of the latter, 7.9 per cent [sic] developed influenza, while 8.3 per cent [sic] of those who wore masks contracted the disease. It will be noted that the attack rate in both groups was much lower than for the personnel in general at the station."

(Exhibit 8)

43.     In regards to real world use in a non-military setting, the city of Edmonton, Alberta, Canada, enacted severe measures as soon as they got their first Spanish Flu case. Masks were mandated 14 days after the first outbreak and initially met with high compliance. After the pandemic passed, Dr. T. H. Whitelaw published a scathing rebuke of the health measures in the Canadian Medical Association Journal specifically stating about masks,

> "Had this mask order been instituted a few days before the epidemic reached its peak, it would probably have been acclaimed as the chief factor in bringing about the rapid subsidence of the epidemic, but unfortunately for the extravagant claims made in justification of the mask order as means of prevention, the number of cases of the disease continued to increase rapidly for some time after the order was enforced, and public confidence in it as a prevention soon gave way to ridicule."

(Exhibit 9)

44.     The number of newly reported cases of Spanish Flu did not begin to subside in Edmonton until December, more than six weeks after the mask mandate was enacted. (Exhibit 9)

45.     It has been observed that the failure of cloth masks to prevent disease transmission during the Spanish Flu of 1918-1919 despite widespread use is proof of the ineffectiveness of cloth masks at preventing disease transmission. (Exhibit 10)

46.     In the 1930s, electron microscopes were developed. Scientists could see viruses for the first time.

47.     In the same decade, surgical masks with superior filtering abilities were developed and their filtering ability continues to improve today.

48.     The debate about the effectiveness of cloth masks at preventing disease continued in the United States, and in the 1960s, several papers were published showing the ineffectiveness of cloth masks, especially after more than 10 minutes of use. A review of these papers, among others, is found in Spooner's 1967 paper, *History of Surgical Face Masks*. (Exhibit 11)

49.     By the end of the 1970's, cloth masks were no longer allowed in any American hospital as personal protective equipment (PPE).

50.     In the United States, most research on cloth masks stopped at this time.

51.     In 2011, Yang et al published *Mask-wearing and Respiratory Infection in Healthcare Workers in Beijing, China* in the Brazilian Journal of Infectious Diseases. In it, they found nurses who wore cloth masks had significantly higher incidences of respiratory illness in comparison to nurses who wore surgical masks. (Exhibit 12)

52.     In 2015, MacIntyre et al, published *A Cluster Randomised Trial of Cloth Masks Compared with Medical Masks* in BMJ Open and found nurses who wore cloth masks had significantly higher rates of respiratory illness than those who wore medical masks. (Exhibit 13)

### B. COVID-19

53.     A newly recognized disease called COVID-19 was announced by the World Health Organization (herein referred to as WHO) on January 5, 2020.

54.     On January 30, 2020, the WHO declared the COVID-19 outbreak a "Public Health Emergency of International Concern."

55.     During a public health crisis, including but not limited to pandemics like COVID-19, government agencies and leaders, including but not limited to Governor Gretchen Whitmer and

Robert Gordon, are afforded some emergency powers to reasonably address public health and safety issues.

56.     In a literature review titled Rapid Expert Consultation on the Effectiveness of Fabric Masks for the COVID-19 Pandemic (April 8, 2020) and the correspondence related to it (herein referred to collectively as "Rapid Response") issued by the National Academies of Sciences, Engineering, and Medicine (herein referred to as "NAS"), after the Centers for Disease Control (herein referred to as the CDC) stated cloth and non-medical masks and facial coverings (herein referred to as "non-medical masks") "*may* prevent asymptomatic spread," [my emphasis] NAS stated,

> "The evidence from these laboratory studies suggests that while fabric masks may reduce the transmission of larger respiratory droplets, there is little evidence regarding transmission of small aerosolized particulates of the size potentially exhaled by asymptomatic or presymptomatic individuals with COVID-19."
> (Exhibit 14)

57.     The NAS' paper called for more quality research on the safety, effectiveness, and tested design of cloth masks.

58.     Since the NAS Rapid Response, most studies published concerning cloth masks are laboratory [theoretical] studies which employ artificially created aerosols with droplets in the visible range. These are the types of studies the NAS relied upon in their Rapid Response and stated were inadequate.

59.     Modeling studies, which are not easily replicable and for which modelers can easily adjust the input numbers or parameters to achieve the desired results, are also in great supply. These have little scientific value, especially when they are used to predict future events based on past unknowns.

60.    Theoretical, laboratory studies and modeling studies conducted prior to their destruction determined the Twin Towers in New York (which were destroyed when airplanes flew into them on September 11, 2000) could withstand the impact of a 747.

61.    Strikingly absent from post-COVID-19 published non-medical mask research are large, significant, peer-reviewed, random-controlled-trials—the gold standard of medical research that the NAS requested.

62.    As Feder stated in *Why Truth Matters: Research versus Propaganda in the Policy Debate*, "…In "truthful" research, the answers are what they are, regardless of the researcher's point of view. By contrast, "propaganda" starts with an answer and relies on research not to find out how things work but to prove a predetermined conclusion." (Exhibit 15)

63.    It is easy to manipulate laboratory studies, modeling studies and to a lesser extent observational studies into propaganda.

64.    It requires much greater direct deviousness to manipulate data from large, random controlled trials that achieve significant results.

65.    The State of Michigan has not conducted any large, significant, peer-reviewed random controlled trials on cloth and non-medical masks nor does it seem to be funding them. (Exhibit 16)

66.    The NAS neglected to comment on the research done prior to the 1980s, which is referenced in the Historical Scientific Background section of this Complaint. It can only be assumed this research was unknown to them due to the rapid nature of their response and their inability to do an in-depth analysis.

67.    On May 2, 2020, Plaintiff's husband, Jason Reinoehl, was notified someone with whom he had close contact (within 3 feet of distance) at work had tested positive for COVID-19.

68.     Due to work mandates, both Jason Reinoehl and the COVID-19 positive individual were both wearing cloth masks given to the by their employer.

69.     On May 3, 2020, Jason Reinoehl began to fill unwell. On May 4, 2020, Jason Reinoehl was administered a COVID-19 test at a testing site after being referred there by a doctor. The test results came back positive for COVID-19 on May 7, 2020.

70.     On January 5, 2020, Plaintiff's father (unnamed for HIPPA reasons), was admitted to the hospital with COVID-19. Plaintiff's father faithfully wears non-medical masks and avoids public areas as much as possible.

71.     It is illogical to think that a mask which cannot prevent viruses from getting into your mouth and nose can prevent viruses from leaving your mouth and nose. Cloth is not a one-way filter.

**C. Mandating Non-Medical Devices**

72.     The U.S. Food and Drug Administration (herein referred to as "FDA") Emergency Use Authorization (herein referred to as "EUA") dated April 18, 2020 and updated May 2020, allowed non-medical masks to be sold in the United States with strict restrictions. (Exhibit 17)

73.     On April 24, 2020, the FDA issued a letter restating what they said in the EUA—that

> "the labeling *must not state or imply* that the product is intended for antimicrobial or antiviral protection or related uses or is for use *such as infection prevention or reduction*;" [my emphasis]. (Exhibit 18)

74.     Police powers allowed a State during medical emergencies are limited by the U.S. Constitution and Federal Law to medical treatments and medical devices of proven ability to treat disease or prevent disease transmission, all of which should be regulated by the FDA under the Food, Drug, and Cosmetic Act under Chapter IV even in emergency situations.

75.     Experimental medical devices and treatments cannot be forced upon the humans for research purposes without informed consent Title 45 §46.116.

76.     Under the Equal Protection Clause of the 14th Amendment, human research volunteers do not have more rights than a citizen who is not the subject of official research.

77.     All non-medical masks can only be sold in the United States under the FDA EUA referenced in #72 and #73 above as "non-medical" devices and must be clearly labeled as such.

78.     Non-medical masks are being classified as "apparel," and therefore are considered exempt from FDA regulation.

79.     No State can compel individuals to wear specific apparel simply because there is an emergency medical situation.

80.     The State's rights to regulate the apparel of its citizens are limited to morality purposes.

81.     To regulate apparel on the basis of health would be akin to mandating citizens wear coats in the winter and shorts in the summer. Coats and shorts, at the appropriate times, *may* also provide a health benefit.

82.     As "apparel," all non-medical masks are only minimally regulated by the Federal Trade Commission and the U.S. Consumer Product Safety Commission. These products must only meet minimal safety standards: (a) they must not contain lead if they are targeted at children and (b) they must be fire resistant if they are targeted at children.

83.     Adult cloth and non-medical masks and face coverings are not being regulated for lead content even though they are worn across the mouth and nose in some cases for hours at a time.

84.     No cloth or non-medical masks or face coverings are being regulated for hazardous materials, including but not limited to asbestos or chromium.

85.     The State of Michigan has more than 558,000 confirmed cases of COVID-19 as reported by Google January 10, 2020. Michigan mask regulations have been in effect since Governor Gretchen Whitmer issued Executive Order 2020-147 (July 13, 2020).

86.     An effective health measure, such as hand washing or covering coughs, works even when there is not 100% compliance.

87.     An effective method of reducing disease transmission works with even 1% compliance because it reduces the amount of transmission by at least 1%.

88.     Cloth and non-medical masks and face coverings have failed to prevent the spread of COVID-19 just as they failed to prevent the spread of Spanish Flu.

**D. Mask Dangers**

89.     Wearing masks improperly can spread disease as noted by the Secretary of the Navy in 1919 and the U.S. Surgeon General on March 27, 2020. (Exhibit 19)

90.     Jason Reinoehl, a normally healthy individual, caught COVID-19 from a person who was wearing a mask after only brief close contact with that person throughout the day.

91.     Plaintiff's father caught COVID-19 while primarily avoiding most public contact with individuals in closed spaces and while always wearing a mask in accordance with published guidelines.

92.     Disposing of masks improperly also spreads disease. Masks are littering the world. (Exhibit 20)

93.     Masks of any kind, including but not limited to N-95s, surgical masks, and cloth masks, can cause negative health changes even in healthy individuals, including but not limited to reduced blood oxygen levels ($SpO_2$%), lightheadedness, increased heart rate, increased exposure

to all infectious diseases, and long term use of cloth masks (niqab) can reduce lung capacity and lead to increased respiratory infections and asthma. (Exhibits 21-29)

94.     Jennifer Reinoehl has breathing and heart issues, including but not limited to asthma and tachycardia.

95.     Wearing a cloth or non-medical mask for (15) minutes or longer increases Jennifer Reinoehl's heart rate, increases her oral body temperature by (1) degree Fahrenheit, and decreases her blood oxygen levels, starting at 20 minutes after first donning the mask and continuing for up to two hours after taking it off.

96.     This does not happen if Plaintiff performs the same activities without a mask. Without a mask, her heart rate elevates during the activity, but returns to normal within (15) minutes of stopping activity. Without a mask, her oxygen levels remain stable even when active.

**E. Discrimination**

97.     Mask mandates harm disabled people in two ways: (a) by forcing or encouraging a person with a breathing disability to wear a mask, which puts his or her health at risk, or (b) by not wearing a mask, the disabled person is marked as being disabled, or worse marked as being a protester, or a selfish person who doesn't care about whether or not they get others sick. With only these two options available to him or her, a disabled person has no recourse for avoiding harm.

98.     On January 4, 2020, Plaintiff, Jennifer Reinoehl, was forbidden from entering the YMCA. In an event she recorded after obtaining permission to do so from the other participant, who appeared to first obtain permission from her supervisor, she was told the YMCA would follow Robert Gordon's mask regulations and not follow the Federal Americans with Disabilities Act of 1990 (herein referred to as "ADA").

99.     Prior to this date, Plaintiff had not been barred from entering the YMCA without a mask

once she had informed them of her breathing problems.

100.    The Gatherings and Face Mask Order issued by Robert Gordon December 18, 2020 states

in pertinent part,

> "8. Exceptions to face mask requirements…the requirement to
> wear a face mask in gatherings as required by this order does not
> apply to individuals who:…
>
> (b) Cannot medically tolerate a face mask;" and
>
> "10. Implementation (a) Nothing in this order modifies, limits, or
> abridges protections provided by state or federal law for a person
> with a disability" and
>
> "7. Face mask requirement at gatherings…
>
> (d)…An individual's verbal representation that they are not
> wearing a face mask because they fall within a specified exception,
> however, may be accepted."

101.    At the same time, Robert Gordon allowed the MDHHS to post advice on its website

directed at those with asthma which states, among other things, "If the doctor does give you a

pass not to wear a mask, *you may not be able to go to places that require them*."[my emphasis]

This explains the mandate in terms that go against ADA regulations, supports businesses and

schools who deny disabled people entry when not wearing a mask even with a doctor's pass, and

pressures individuals with disabilities to avoid seeking ADA accommodation requirements by

informing them they can still be denied entrance to businesses. (Exhibit 30)

102.    Businesses within the State could use the statements made on the website (and quoted in

#100) to deny anyone services for not wearing a mask regardless of statements in Robert

Gordon's official Order.

103.    This same flyer quoted in #101 also states people with asthma "can wear a face mask."

(Exhibit 30)

104.    Whether or not a person "can" wear a face mask is advice that only a doctor familiar with the patient's individual case should give.

105.    The MDHHS has also issued advice directed at medical providers, which states, among other things, "The decision to give face mask exemptions should not be taken lightly and should be considered only in extreme circumstances," and "During the pandemic, people who are having active breathing problems should stay home except to seek medical care." (Exhibit 31) This advice encourages inhibiting the movement and public access of the disabled, makes it more difficult for disabled children to obtain waivers required for school entrance, and avoids ADA accommodation requirements.

106.    The advice Robert Gordon allowed to be posted on the MDHHS is in contradiction to the order and infringes upon rights given to the disabled in both the ADA, Federal Law, and Michigan Law.

107.    The advice allowed to be posted on the MDHHS by Robert Gordon wrongly pushes culpability on doctors and others following the advice and circumvents due process, allowing Robert Gordon to act under the color of law.

108.    Plaintiff, Jennifer Reinoehl, was barred from fully entering the Niles branch of the YMCA on the basis of Robert Gordon's order.

109.    Plaintiff suffered emotional pain and suffering when she was not allowed to fully enter the YMCA and view her daughter swimming.

110.    Plaintiff lost hours of work doing research that Governor Gretchen Whitmer and Robert Gordon should have done themselves prior to issuing public health orders.

111.    In *In Re Certified Question (Midwest Inst of Health V*, 161492 (Mich. 2020), the Court determined Governor Gretchen Whitmer cannot exercise emergency powers indefinitely.

112.    Robert Gordon is continuing to exercise emergency powers for Governor Gretchen Whitmer despite the ruling in *In Re Certified Question (Midwest Inst of Health V*, 161492 (Mich. 2020).

## IV.    **ARGUMENT**

113.    The police power afforded to governments to reasonably address public health and safety issues is not limitless.

114.    The rights secured by the United States Constitution and the Constitution and Laws of the State of Michigan do not disappear during a public health crisis.

### E. Jacobson v. Massachusetts

115.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), in which the Supreme Court ruled that it was acceptable for Massachusetts to mandate all healthy citizens take a smallpox vaccination or be fined a one-time fee of $5 (about $150 adjusted for today), is frequently used to support State police power in the face of public health emergencies, among other things.

116.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), does not apply here because Robert Gordon through the MDHHS is allowing places of business to discriminate and suppress rights of a citizen or visitor to the State who has a medical exemption.

117.    The Court held in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) that Jacobson had the appearance of a healthy man and had not provided admittable evidence to the contrary. It also noted adults could obtain exemption from vaccination and fine if they presented a doctor's exemption.

118.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because the Court noted that Jacobson offered no material evidence into the case, including but not limited to scientific evidence in opposition to vaccination or medical evidence of his health problems.

119.    Plaintiff in this case historical, scientific, and medical evidence. (Exhibits 1-33)

120.    Plaintiff is willing to submit her medical records supporting her breathing impairments to the court during discovery.

121.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because it was predicated on the centuries of scientific evidence showing the safety and effectiveness of the vaccine.

122.    The evidence specifically included, but is not limited to: (a) The first statistics on case-fatality rates between the smallpox disease and variolation (the precursor to vaccination) were collected during the Boston smallpox plague in 1721 and showed a reduction in death for those variolated; (b) When Jenner discovered the safer cowpox virus also provided protection in 1796, vaccination became widespread; (c) The smallpox vaccine had the support of President Madison, who signed "An Act to Encourage Vaccination" in 1813. (d) There were more than 200 years of scientific evidence supporting the scientific safety and effectiveness of smallpox's variolation and vaccination methods prior 1905, and (e) In 1905, smallpox vaccination was a scientifically and medically accepted method of preventing smallpox and had been for almost a century.

123.    In contrast, scientists today are still divided in peer-reviewed literature on the safety and effectiveness of cloth masks and any mask used by the general public, despite their hundreds of years of use.

124.    Cloth masks and facial coverings failed to prevent the spread of Spanish Flu. (Exhibit 8, 9)

125.    Wearing any mask comes with health risks to all the people who wear them. (Exhibit 21-29)

126.    The ineffectiveness of cloth masks and facial coverings to prevent disease transmission has kept them out of U.S. hospitals since the 1970s.

127.    The FDA required that manufacturers do not place anything on their labels that would mislead consumers into believing they can prevent disease transmission. (Exhibit 17, 18)

128.    "Non-medical" masks, confusingly designed to look identical to surgical masks, have never been tested for safety and effectiveness and are experimental in nature.

129.    The evidence against non-medical mask effectiveness is stronger than the evidence for it.

130.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because smallpox is a much deadlier disease than COVID-19.

131.    Smallpox is a disease with an average 30% case-fatality rate across all age groups. Among those vaccinated who then acquired the disease, case-fatality rates ranged from 1.3%-11%. The vaccine itself had a case-fatality of 0.0002%. Smallpox affects young and old alike.

132.    Without vaccination, COVID-19 is a disease with a case-fatality rate of 1.7% in the United States (2.6% in Michigan) calculated based on statistics reported to Google January 9, 2020, making it more than 11 times less deadly than smallpox in unvaccinated individuals and much less deadly than smallpox was in most vaccinated individuals. In addition, COVID-19 primarily kills people over the age of 65 who have multiple comorbidities.

133.    In 1905, when there was no other method of treating smallpox or preventing its spread *and* when vaccination was shown by more than 200 years of research to be safe and effective at preventing its transmission, *and* when the majority of the members of the medical and scientific community supported vaccination, freely vaccinating healthy people by mandate or requiring them to pay a fine that would be the equivalent of about $150 today was reasonable, and the

Court did not err in its opinion under those conditions in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

134.    In 2021, when there are many methods of treatment for COVID-19, when there are many methods of preventing its transmission that are supported by the majority of the scientific community (some of which have not been executed or have been poorly executed in their entirety by the State of Michigan under the direction of Governor Gretchen Whitmer and Robert Gordon), when other methods do not infringe Constitutional Rights, when COVID-19 is not a deadly disease in comparison to many other diseases, when the safety and effectiveness of non-medical masks has not yet been determined in the scientific community, and when the FDA is refusing to regulate non-medical masks for safety and effectiveness, a mask mandate is unreasonable, arbitrary and unwarranted.

135.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in it, the Court stated, "Although this court has refrained frained [sic] from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate *to matters completely within its territory and which do not by their necessary operation affect the people of other states*," [my emphasis]. Mandating masks in order to enter any business or public space within the state of Michigan affects the people of other states, including visitors coming from other states.

136.    In the case of mandated masks, references more appropriate than *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) would include but not be limited to the cited *Gibbons v. Ogden*, 22 U.S. 9 Wheat. 1 1 (1824).

137.    The ruling in *Gibbons v. Ogden*, 22 U.S. 9 Wheat. 1 1 (1824) (the state sought to preserve its waterways solely for its residents) supports Plaintiff's claims—a state cannot regulate public waterways (or in this case public areas) in a way that prevents or inhibits citizens of other states from using them or prevents citizens from other states from conducting commerce in that state. Mandated masks interfere with the rights of citizens of other states.

138.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in 1905, the U.S. military, including the now Federally funded National Guard, could not have been called in to quickly build field hospitals that could care for the sick, as they were called in to do at the beginning of the COVID-19 pandemic in New York. (Exhibit 34)

139.    State leaders have used the excuse they would "run out of hospital beds" as a justification for ignoring Constitutional Rights and exercising unlimited police power since March 17, 2020, when Ferguson, et al's now discarded model was first introduced with that claim.

140.    President Trump quickly authorized additional Military hospitals in response to the claim we would "run out of hospital beds," including a fully operational and almost instantly available 1000 bed Navy medical ship in New York. (Exhibit 34)

141.    These military hospitals in New York were used by only a few people and in some cases were not used at all before being taken down because they were deemed not necessary and because they were costing taxpayers money without being used. (Exhibits 34-35)

142.    Since the Navy's well-researched report on Spanish Flu in 1919 stated the only thing a government could do to stem deaths during a pandemic was "build more hospitals," this should be an important medical recourse for any government during a pandemic, especially since it does not interfere with Constitutional Rights.

143.    Quickly erected military field hospitals provide ideal containment facilities for sick who test positive for COVID-19. These would keep COVID-19 positive people away from other sick people who do not have the disease, supporting isolation efforts.

144.    Military field hospitals could specialize in COVID-19 treatment to improve the quality of care for these patients, reducing case-fatality rates and potentially reducing personal protective equipment demands.

145.    Field hospitals could treat on an in-patient basis both the seriously ill and the mildly ill, which would help isolate COVID-19 patients with active symptoms and prevent them from spreading the disease in the community.

146.    The FMLA gives sick workers the ability to stay home (or in a field hospital) without fear of being fired, making containment and isolation easier and less restrictive on Constitutional Rights.

147.    Finally, contained COVID-19 treatment facilities allow hospitals and other medical services to continue operating as normal and reduce fatalities caused when "unnecessary" medical services are randomly prohibited or delayed by State leaders' unscientific methods of controlling the pandemic.

148.    During the COVID-19 pandemic, the ability of States, including but not limited to the State of Michigan, to build field hospitals has gone virtually unused, while State leaders, including but not limited to Governor Gretchen Whitmer and Robert Gordon, continue to claim they will "run out of hospital beds" if their emergency mandates are not followed and Constitutional Rights of healthy individuals are not set aside.

149.    Failing to use options that would not violate Constitutional Rights in favor of ones that trample them is an abuse of power that must not go unchecked.

150.     *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because most people at the time, including medical workers, were not aware of the importance of hand washing and covering coughs to prevent disease transmission. The existence of viruses was debated as were most methods of disease control. There were at least (7) vaccines available at the time. Vaccines were the only known preventative that worked in all cities.

151.     Scientists and doctors now know how small the smallpox virus is and how it spreads from active sneezing, coughing, and close contact, including but not limited to hugging (droplet), or spread from aerosol (air contamination by viral particles from the infected), or spread from articles touched by the victim including but not limited to clothing (fomite) through viruses. Other now known methods of disease transmission include but are not limited to fecal-oral, animal vectors, and sexual transmission.

152.     We now know, among other things, that hospitals are a major source of disease transmission as are germy hands and coughs and sneezes that people do not cover with a hand or elbow.

153.     Plaintiff hopes a detailed list of all the modern disease prevention methods is unnecessary, but offers as an example some that were incorporated in plans to eradicate smallpox (when vaccination alone did not work) and guinea worm (for which there is no vaccination).

154.     In 1966, the WHO began a smallpox eradication plan. It relied on community education, early identification of cases, early isolation of the sick, and targeted vaccination. The last known worldwide case of smallpox occurred 10 years later, in 1976. (Exhibit 42)

155.     Mass masking of healthy individuals was not a part of the smallpox eradication plan-nor was any other forced mass compliance with health orders.

156.    The Guinea worm eradication program consists primarily of educating locals, finding and isolating case outbreaks rapidly, early treatment, and water purification. (Exhibit 42)

157.    Governor Gretchen Whitmer and Robert Gordon are relying on methods that take away Constitutional Rights and "may" work instead of relying on time-proven methods of disease control that do work without infringing on those Rights.

158.    Faith in non-medical masks' abilities to stop droplets as preached by Governor Gretchen Whitmer and Robert Gordon, has led many to stop covering their coughs when masked—thus exchanging a known disease preventative (covering coughs) for an unknown one that has not been effective in previous pandemics.

159.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in 1905 powerful disinfectants, including but not limited to quaternary ammonium compounds, had not yet been discovered. Hand sanitizer and disposable tissues were non-existent.

160.    Although cloth masks were available (and notably not mandated by Cambridge or even considered as a method of disease prevention), their effectiveness is and was at the time debated.

161.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here because in addition to knowledge and powerful disinfectants, we have antiviral medications to treat diseases caused by viruses and antibiotics to treat secondary infections caused by bacteria. We have diagnostic machines, and the ability to quickly create tests, perform them, and obtain results, including but not limited to nasal swab tests, which help us pin-point who has the disease and who does not.

162.    There were no known, effective treatments for smallpox in 1905, and vaccination was the only known, effective method of prevention.

163.    Another reason *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) does not apply here is because some of the arguments of the Court were founded upon precepts that no longer apply

since many Federal laws have been passed in the past 115 years, which further secure the rights

of citizens. For example, the statement by the Court that

> "The liberty secured by the 14th Amendment, this court has said,
> consists, in part, in the right of a person 'to live and work where he
> will' (*Allgeyer* v. *Louisiana*, 165 U. S. 578, 41 L. ed. 832, 17 Sup.
> Ct. Rep. 427); and yet he may be compelled, by force if need be,
> against his will and without regard to his personal wishes or his
> pecuniary interests, or even his religious or political convictions, to
> take his place in the ranks of the army of his country, and risk the
> chance of being shot down in its defense"

no longer applies since 50 U.S. Code § 456 passed June 24, 1948 allows people to avoid military

service or active duty if they are a conscientious objector (a person who, for reasons of

conscience, objects to military service).

164.    If in 1905 a man could be forced to take a vaccination on the basis that he could also be

compelled to be shot at in the army of his country, then in 2021, since he can no longer be

compelled to be shot at in the army of his country by simply declaring reasons of conscience, he

also can no longer be compelled to take a vaccination or follow mask mandates as a manner of

conscience.

165.    U.S. Const., 14th Amendment § 5 gives Congress the right to legislate States.

166.    Congress in the past 115 years has used that right to strengthen the rights of the people

through Acts including but not limited to 50 U.S. Code § 456, the Civil Rights Act of 1964, and

the ADA.

167.    Another important difference is that in *Jacobson v. Massachusetts* 197 U.S. 11 (1905),

the Court believed those making public health decisions "presumably" had the knowledge to do

so.

28

168.   Michigan Public Health Code Act 368 of 1978 § 333.17011 prohibits individuals from practicing medicine in the State of Michigan unless the individual is licensed or otherwise authorized by said article.

169.   Neither Governor Gretchen Whitmer nor Robert Gordon have a license to practice medicine in the State of Michigan nor do they meet other requirements of licensure stated in the Michigan Public Health Code Act.

170.   Similarly, Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993) requires standards before expert testimony is admitted to the Court—neither Governor Gretchen Whitmer nor Robert Gordon meet these standards in the subject of medicine but are dictating medical advice to the citizens of the State of Michigan and its visitors.

171.   That neither Governor Gretchen Whitmer nor Robert Gordon are qualified to make health decisions is evident in their actions.

172.   Robert Gordon erred when he allowed the MDHHS to post information that failed to recognize that lung diseases, including but not limited to asthma and COPD, are not the only medical issues that cause breathing problems. Other diseases that can cause breathing problems include but are not limited to heart disease, obesity, and anxiety. (Exhibit 30)

173.   Robert Gordon allowed the MDHHS to post information in err stating, "If your asthma symptoms keep you from wearing a mask, call your doctor right away for help getting your asthma under control." (Exhibit 30) This statement mistakenly assumes all asthma patients can afford to see a doctor whenever they want and mistakenly assumes all asthma can be treated.

174.   It would be extremely offensive to tell an obese person to "call a doctor right away for help getting your" weight "under control."

175.   It is no less offensive to tell this to the estimated 4% of people who have severe asthma.

29

176.    Robert Gordon erred and failed the *Daubert* test when he allowed the MDHHS to post

information about asthma stating, "N95 masks should be saved for healthcare workers" but on

the same page stating "wearing a mask can also help block asthma triggers like common cold

viruses, cold air, pollen, and animal dander." (Exhibit 30)

177.    N95 masks are the only masks scientifically capable of blocking viruses, pollen, and

animal dander.

178.    Robert Gordon erred, practiced medicine without a license, failed the *Daubert* test, and

breached the patient-physician relationship when he allowed the MDHHS to post information

stating everyone with asthma "can wear a mask," instead of telling everyone to seek the advice

of his or her doctor on the matter. (Exhibit 30)

179.    Robert Gordon did not respect the standards of scientific and medical research when

allowed the MDHHS to post they "worked with experts" without naming them, and when he

allowed MDHHS to post a "provider version" of Exhibit 30 which lacks references and the

professionalism required of research presented to medical providers. (Exhibit 31)

180.    Robert Gordon erred, practiced medicine without a license, failed the *Daubert* test,

misconstrued important medical information and when he allowed the MDHHS to post

information to providers that states,

> "The decision to give a face mask exemption should not be taken
> lightly and should be considered only in extreme circumstances. A
> joint statement recommending that people with asthma and other
> severe lung diseases wear masks to help prevent the spread of
> COVID-19 was recently issued by the American College of Chest
> Physicians, American Lung Association, American Thoracic
> Society, and COPD Foundation..."  (Exhibit 31)

The actual statement from the American College of Chest Physicians, et al, (a) mentions that the

authors of the statement only considered studies done on healthy individuals using N-95s, which

are regulated by the FDA and *must meet breathability and filtration standards*, and (b) states in

regards to face mask exemptions, "The decision to give this exemption should be at the

discretion of the treating physician." (Exhibit 36)

181.    Robert Gordon allowed public posts on the MDHHS that misconstrued statements made

by medical authorities in order to support his mask mandate.

182.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) acknowledges,

> "We say necessities of the case, because it might be that an
> acknowledged power of a local community to protect itself against
> an epidemic threatening the safety of all might be exercised in
> particular circumstances and in reference to particular persons in
> such an arbitrary, unreasonable manner, or might go so far beyond
> what was reasonably required for the safety of the public, as to
> authorize or compel the courts to interfere for the protection of
> such persons."

183.    *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) was never meant to be definitive.

184.    *Jacobson v. Massachusetts* 197 U.S. 11 (1905) needs to be revisited on its own merits

well as on the merits of the laws enacted since it was decided and the merits of the improvements

made to healthcare.

**B. Emergency Powers Are Limited**

185.    Emergencies and the powers granted to leaders during them, do not last indefinitely and

have both a beginning and an end. The COVID-19 "state of emergency" was declared over 10

months ago.

186.    The WHO defines "state of emergency" as

> "A 'state of emergency' demands to 'be declared' or imposed by
> somebody in authority, who, at a certain moment, will also lift it.
> Thus, it is usually defined in time and space, it requires threshold
> values to be recognized, and it implies rules of engagement and an
> exit strategy"

187.    In *In Re Certified Question (Midwest Inst of Health V*, 161492 (Mich. 2020), the

Supreme Court of Michigan stated

31

"We conclude that the Governor lacked the authority to declare a 'state of emergency' or a 'state of disaster' under the EMA after April 30, 2020, on the basis of the COVID-19 pandemic. Furthermore, we conclude that the EPGA is in violation of the Constitution of our state because it purports to delegate to the executive branch the legislative powers of state government-- including its plenary police powers-- and to allow the exercise of such powers indefinitely."

188.    In a gross obstruction of justice, Robert Gordon, who was appointed to his position by Governor Gretchen Whitmer despite a lack of medical training or license, using the color of law granted to him as Director of the MDHHS, immediately re-enacted all the restrictions Governor Gretchen Whitmer had enacted after the Michigan Supreme Court ruled she had abused her power.

189.    Governor Gretchen Whitmer and Robert Gordon colluded to maintain emergency police state prohibitions on citizens of the State of Michigan and its visitors with blatant disregard for the Michigan Supreme Court.

190.    There has been adequate time for government officials to stabilize health systems, to implement testing, research and education, and to create contact tracing procedures.

191.    It is no longer the appropriate role of governors and unelected health officials to dictate policy and mandate health measures.

192.    It has never been the role of persons not licensed in medicine to dictate medical treatments or policies for preventing disease transmission.

193.    Non-medical masks are not approved by the FDA for preventing the spread of any disease.

194.    Any and all statements about the effectiveness of non-medical masks in preventing disease transmission that were made by Governor Gretchen Whitmer and Robert Gordon are in opposition to the FDA's EUA issued April 9, 2020.

32

195.    Using non-medical devices for medical purposes when they are not regulated by the FDA is experimental and dangerous, and should never be compelled upon a person Title 45 §46.116. (Exhibits 32, 33)

196.    Currently, in *United States v. Grenon* (1:20-mj-03050) the United States is suing individuals who sold a product as a cure for COVID-19 that was not approved by the FDA for the treatment of COVID-19. This is not the first case the United States government has brought against individuals for selling "treatments" and "preventatives" that are not approved by the FDA for treating or preventing disease.

197.    Governor Gretchen Whitmer and Robert Gordon are pivotal in encouraging masks that are not being regulated by the FDA to be worn by consumers, including those with breathing disabilities.

198.    Governor Gretchen Whitmer and Robert Gordon are pivotal in encouraging consumers to wear these non-medical masks for extended periods of time despite the known medical risks to healthy people that all masks cause when worn for extended periods of time.

199.    Although Governor Gretchen Whitmer and Robert Gordon did not manufacture non-medical masks or distribute them, in *Bolger v. Amazon.com, LLC*, 53 Cal. App. 5th 431, 447–62, 267 Cal. Rptr. 3d 601, 612–25 (2020), the Court ruled against Amazon stating that "Whatever term we use to describe Amazon's role, be it 'retailer,' 'distributor,' or merely 'facilitator,' it was pivotal in bringing the product here to the consumer."

200.    Governor Gretchen Whitmer and Robert Gordon have had 10 months to commission or cause to be commissioned significantly large random controlled trials of a variety of masks, including but not limited to several designs of cloth masks, in order to determine their safety and effectiveness in hospital and community settings but have not done so.

201.    Early identification and contact tracing, isolating the sick, and increasing the numbers of

hospital beds are all scientifically and medically accepted methods of controlling disease that do

not massively infringe on Constitutional Rights.

202.    Michigan's contact tracing was not started until more than 30,000 cases COVID-19 had

been detected in the state. Fewer than 4,000 volunteers were dedicated to this task.

203.    Policies preventing "unnecessary" medical care did not increase hospital beds and

medical workers, but instead decreased them.

204.    Instead of policies that encouraged the sick to seek treatment, persons who tested positive

for COVID-19 were treated as if they were zombies from a Hollywood movie. Unscientific,

draconian methods and statements made contradicting scientific facts made people fearful of

seeking treatment and distrustful of the government. Putting millions of healthy people out of

work for no reason did not improve the situation.

205.    Ending non-medical mask and lock down mandates, allowing people to return to their

work without fear that it will be soon shut down again, explaining medical policies, treatment

options, vaccination options, and best practices for prevention to the public in a non-threatening,

consistent way and increasing medical treatment facilities and personnel if needed through the

National Guard, will help citizens feel reassured and less fearful, reduce riots (based on more

than 1000 years of police power and pandemic history), and encourage people to seek medical

treatment and submit to isolation.

206.    Governor Gretchen Whitmer and Robert Gordon are not pursuing the above methods of

disease control but are continuing to practice medicine without a license and continuing to ignore

the State Court and continuing to rule Michigan with the same policies that have failed to slow

the spread of COVID-19 and have kept Michigan case-fatality rates high for 10 months.

34

**C. Discrimination**

207.   The United States Constitution and the Constitution and Laws of Michigan give citizens equal treatment and equal protection under the law.

208.   The ADA requires people with disabilities of all kinds to have public access.

209.   Actively trying to prevent citizens of the United States from obtaining disability accommodations through intimidation techniques directed at both them and their doctors is not providing them with equal protection.

210.   Governor Gretchen Whitmer and Robert Gordon have infringed upon the ADA by not considering the accommodations needed by its disabled citizens and disabled visitors to the State.

211.   Health authorities headed by officials licensed to practice medicine have repeatedly stated it is more important to remain 6' apart—a safe, easy accommodation for disabled people, as well as one for those wishing to exercise their freedom of speech, those wishing to exercise their right to protest, and those wishing to freely practice their religion—than it is to wear masks.

212.   This lawsuit challenges the mask mandate Governor Gretchen Whitmer and Robert Gordon have enacted under the color of law through the MDHHS.

213.   Governor Gretchen Whitmer and Robert Gordon exercised police power under the color of law which illegally infringed upon the fundamental rights of the Plaintiff.

214.   Governor Gretchen Whitmer and Robert Gordon have invested state and federal funds in scientifically debated methods of disease control including but not limited to quarantining healthy individuals and mandating masks instead of using funds on other more scientifically accepted methods of disease control.

215.    This non-medical mandate is in violation of the United States Constitution and Federal Law, and Michigan Law.

216.    Without injunctive relief, Plaintiff and those similarly situated, will suffer irreparable harm, which includes, but is not limited to, the following: loss of her State and Constitutional rights and freedoms and other losses which will continue to cause her pain and suffering and which may cost her life, as she is forced to make the choice between such things as risking her life and filing this lawsuit or between risking her life or losing her chance to watch her child swim until whenever it so pleases Robert Gordon to lift the mask mandate.

217.    Plaintiff bring this lawsuit under the Federal Constitution, the ADA, and corresponding Federal law. She seeks declaratory relief, injunctive relief, and damages from the unconstitutional deprivation of rights and the disregard for the ADA.

## V.    CAUSES OF ACTION

## COUNT I: VIOLATION OF AMERICAN DISABILITIES ACT

218.    All paragraphs of the Complaint are incorporated herein.

219.    The ADA 42 U.S. Code § 12182 states in pertinent part,

> "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

220.    Michigan's Persons with Disabilities Civil Rights Act 220 § 37.1102 states,

> "(1) The opportunity to obtain employment, housing, and other real estate and full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability is guaranteed by this act and is a civil right.

221.    Michigan's Persons with Disabilities Civil Rights Act 220 § 37.1302 states,

36

"Except where permitted by law, a person shall not: …(b) Print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service will be refused, withheld from, or denied an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids, or that an individual's patronage of or presence at a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids."

222.    Governor Gretchen Whitmer's and Robert Gordon's decision to mandate non-medical masks mark the Plaintiff for ridicule and harassment when she is not wearing a mask in a similar way Jewish people were marked by Hitler with a star.

223.    Posting information that encourages physicians to limit the movement of the disabled (by telling them to stay home) restricts the rights of the disabled to equal, full public access.

224.    Posting information that encourages physicians to not provide mask waivers except under "extreme" circumstances is discriminatory and dangerous in that it pressures physicians to ignore the needs of their patients.

225.    The actions of Governor Gretchen Whitmer and Robert Gordon abrogate federal and state law.

226.    The Defendants, through their actions, have exceeded their emergency authority and deprived Plaintiff of her fundamental rights, privileges and immunities afforded under the law and seek damages, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT II: VIOLATION OF FIRST AMENDMENT AND MICHIGAN CONSTITUTION ART. 1 § 5

227.   All preceding paragraphs are incorporated herein.

228.   The U.S. Const., 1st Amendment states in pertinent part,

> "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof or abridging the freedom of speech..."

229.   The Michigan State Constitution of 1963 states in Art. 1 § 5,

> "Every person may freely speak, write, express and publish his views on all subjects, being responsible for abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

230.   Sticking a mask of any kind over your mouth while in public mechanically abridges your freedom of speech by muffling your voice and making your words difficult to understand.

231.   Further, while some people cannot wear non-medical masks because of disabilities, other people may choose to not wear non-medical masks out of protest against the discrimination suffered by disabled people during mask mandates.

232.   In *Tinker v. Des Moines Independent Community School District* (1969) (which addressed whether students could wear symbols of their support to end the Vietnam War) the Supreme Court stated in pertinent part

> "our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputations, society. In order for the State...to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."

233.   The Defendants cannot show how forcing the public to wear a "non-medical" mask which the FDA is refusing to regulate and which the FDA clearly warns their manufacturers about making claims they can prevent disease transmission is an action they ordered based on

anything but "a desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."

234.   The Michigan State Constitution of 1963 states in Art. 1 § 4, in pertinent part,

> "Every person shall be at liberty to worship God according to the dictates of his own conscious…The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."

235.   Non-medical masks have been used since ancient times in pagan religious ceremonies to ward off evil spirits and prevent illness.

236.   During the 1910-1911 Manchurian pneumonic plague, masks were stamped with the Imperial Seal and worn by citizens as amulets to prevent infection—sometimes worn around necks or weapons instead of covering the nose and mouth. (Exhibit 37)

237.   Wearing a non-medical mask as a preventative when it failed to prevent disease transmission during the Spanish Flu of 1918-1919 and failed to stop bacteria in multiple experiments is equivalent to wearing a pagan religious talisman on one's face for the same purpose.

238.   Wearing talismans and other pagan, non-medical masks is against Plaintiff's religion.

239.   Mandating everyone wear non-medical masks to prevent disease when the mask manufacturers cannot make claims they prevent disease transmission is the same as the State establishing a religion in which the Mask Deity prevents its wearers from becoming infected with disease.

240.   Plaintiff has the right to speak freely in the State without being mechanically barred from doing so.

241.    Plaintiff has the right to protest non-medical mask mandates by refusing to wear a non-regulated, non-medical mask, whose manufacturers cannot make claims about its ability to prevent disease transmission.

242.    The State cannot mandate Plaintiff follows its religion. Plaintiff has the right to freely exercise her religion according to the dictates of her own conscious.

243.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered damages.

244.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities afforded under the law and seeks damages, reparations, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT III: VIOLATION OF FOURTH AMENDMENT

245.    All preceding paragraphs are incorporated herein.

246.    The U.S. Const., 4th Amendment states in pertinent part,

> "The right of the people to be secure in their persons…and effects,
> against unreasonable searches and seizures, shall not be violated..."

247.    The mask mandates in combination with other materials Governor Gretchen Whitmer and Robert Gordon allow to be posted on state websites circumvent U.S. Const., 4th Amendment right to due process and that same right bestowed by Art. 1 § 17 of the Michigan State Constitution of 1963.

248.    In *Mrs. Terrie Curran, Plaintiff, v. City of Youngstown et al., Defendants,* No. 186118 In the Court of Common Pleas, Mahoning County, Ohio (April 21, 1969), the City of Youngstown attempted to enact a law requiring people wear shoes downtown, but the law was stricken with the Court stating

40

> "…that a state's police power can be properly
> exercised <u>only</u> where there is a reasonabie [sic] relationship to the
> public health, safety, morals, or welfare…"

249.    In *Breen v. Kahl*, 296 F. Supp. 702 (W.D. Wis. 1969) the court ruled that public schools

could not limit the length of students' hair, stating,

> "For the state to impair this freedom, in the absence of a
> compelling subordinating interest in doing so, would offend a
> widely shared concept of human dignity, would assault personality
> and individuality, would undermine identity, and would invade
> human "being"."

250.    There must be compelling evidence of a serious health need and a known, scientifically

and medically supported health benefit that will meet that need before state can mandate a health

treatment or disease preventative.

251.    Health measures enacted by Governor Gretchen Whitmer and Robert Gordon were

.enacted prior to a health need being established. They were instead acted in order to *prevent* a

*predicted* health need.

252.    The United States Courts do not recognize injuries that "might" have occurred in

personal injury cases. Similarly, public health disasters that "might" occur should not be grounds

for the removal of Constitutional Rights.

253.    Even with the knowledge that another one of the now known 4000 variations (mutations)

of COVID-19 has been found in Michigan, is not cause for an extension of emergency powers,

since predictions and "might"s are all we know about this "newly discovered" variant.

254.    The FDA is not regulating non-medical masks nor can manufacturers make claims non-

medical masks prevent the spread of any disease.

255.    Like homeopathic remedies, non-medical masks should be used by the public "at its own

risk." (Exhibit 32, 33)

41

256.    If the Federal agencies tasked by law with regulating "apparel" and "medical devices"

consider non-medical masks to be "apparel," the court should treat them as "apparel," like shoes

and socks and hair bows, and the Court should not treat them as if they were "medical devices"

like N-95 masks, which are being regulated by the FDA.

257.    Plaintiff has the right to be secure in her person unless there is compelling evidence of a

health need. She should not be forced to wear items that are classified as "apparel," must be

labeled "non-medical" devices, cannot make claims of preventing disease, and that are not being

regulated for safety and effectiveness by the FDA.

258.    Compelling evidence in the medical community for public health interventions involves

random controlled trials—not scarce circumstantial evidence built upon hearsay and opinions

(including but not limited to after-the-fact observational studies, laboratory studies, and non-

replicable modeling papers), that are easily used for propaganda instead of scientific truth.

259.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein,

Plaintiff has suffered damages.

260.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein,

Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities

afforded under the law and seeks damages, reparations, declaratory relief, and injunctive relief to

prevent such further deprivation.

## **COUNT IV: VIOLATION OF FIFTH AMENDMENT**

261.    All preceding paragraphs are incorporated herein.

262.    The U.S. Const., 5th Amendment states in pertinent part, "No person shall be…deprived

of life, liberty, or property, without due process of law…"

263.    The Michigan State Constitution of 1963 states in Art. 1 § 17,

> "No person shall be compelled in any criminal case to be a witness
> against himself, nor be deprived of life, liberty or property without
> due process of law. The right of all individuals, firms, corporations
> and voluntary associations to fair and just treatment in the course
> of legislative and executive investigations and hearings shall not be
> infringed."

264.    Under Michigan Public Health Code, the Director of the Health Department is

specifically given the ability to prevent public gatherings and to quarantine suspected carriers ex

parte for 72 hours without trial (Michigan Public Health Code Act 368 § 333.5253 and

§333.5207). He is not specifically given the ex parte abilities Director Robert Gordon has taken

including but not limited to closing businesses en masse and mandating masks.

265.    Michigan Public Health Code Act 368 § 333.5207 requires notice of a hearing for forced

quarantine to be served upon an individual held ex parte. This code provides a method of due

process even for contagious individuals and preserves due process during outbreaks of infectious

diseases.

266.    Citizens of the State of Michigan and visitors to the State are not provided with any

method of due process for fighting mandated non-medical masks.

267.    Mandated non-medical devices are not specified within the realm of medical emergency

powers nor should any non-medical device be considered a necessary part of an "emergency

medical procedure."

268.    Although the Michigan Public Health Code repeatedly states "Emergency procedures

shall not be limited to this code," this cannot be construed to mean the MDHHS leaders have

unlimited power to deprive its citizens and visitors to the state of any and all their Federal

Constitutional Rights and the Rights provided to them by Michigan State Law and enact

whatever orders they choose, lest the Director of the MDHHS, and specifically Robert Gordon,

be given the power, among others, to kill all citizens testing positive for COVID-19 by injecting

them with bleach or spray Lysol in the nose and mouths of everyone entering Michigan buildings.

269.     These suggested methods would stop the spread of COVID-19, but they would also cause serious harm, death, and rights violations to the citizens and visiting non-citizens of the state.

270.     Although the Michigan Public Health Code repeatedly states "Emergency procedures shall not be limited to this code," this also cannot be construed to mean the MDHHS has unlimited power to deprive its citizens and visitors to the state of any and all their Federal Constitutional Rights and the Rights provided to them by Michigan State Law without due process since due process is preserved in the ex parte isolation acts specifically mentioned.

271.     Although the Michigan Public Health Code repeatedly states "Emergency procedures shall not be limited to this code," this cannot be construed to mean the MDHHS has unlimited power to force all its citizens and visitors to wear non-medical devices without regard to the dangers these devices present to the health of its citizens and visitors especially in light of the amount of scientific evidence that shows non-medical masks to be ineffective at controlling disease.

272.     As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered damages.

273.     As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities afforded under the law and seeks damages, reparations, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT V: VIOLATION OF FOURTEENTH AMENDMENT

274.     All preceding paragraphs are incorporated herein.

275.    The U.S. Const., 14th Amendment § 1 expands what was written in the U.S. Const., 5th

Amendment,

> "No State shall make or enforce any law which shall abridge the
> privileges or immunities of citizens of the United States; nor shall
> any State deprive any person of life, liberty, or property, without
> due process of law; nor deny to any person within its jurisdiction
> the equal protection of the laws."

276.    The U.S. Const., 14th Amendment § 5 states,

> "The Congress shall have power to enforce, by appropriate
> legislation, the provisions of this article."

## (A): 42 U.S.C. § 1983, VIOLATIONS OF SUBSTANTIVE DUE PROCESS

277.    All paragraphs of the Complaint are incorporated herein.

278.    Government actions that burden the exercise of fundamental rights are subject to strict

scrutiny and will be upheld only when they are narrowly tailored to a compelling government

interest.

279.    Mask mandates have not been enacted upon the general public in the United States since

the 1918 Spanish Flu pandemic, wherein they failed to stop both the spread and fatality rate of

the pandemic, even in controlled military situations (Exhibit 8).

280.    Michigan is a state with almost 9.987 million residents. January 10, 2021, Michigan had

reported 2,745 new cases that day according to Google or about 0.03% of its population. Google

also showed that from March 19-March 27, 2020, (eight days), new, daily COVID-19 cases in

the entire state of Michigan went from 254 to 778 (0.000025% to 0.000078%).

281.    For reference, Camp Grant was a military installation with about 40,000 total residents.

At the height of the Spanish Flu, Camp Grant had 788 cases in one day or about 2% of its total

population. It jumped from 70 cases to 788 cases in the first eight days of the outbreak (0.175%

of its total population to 2% of its total population).

45

282.    The current (January 2021) case-fatality rate (or number of deaths per 100 cases) for COVID-19 in the U.S. is about 1.7% and falling each month as cases-per-day rise and deaths-per-day remain relatively even. This is much lower than the 9.6% case-fatality rate COVID-19 was predicted to have in April 2020.

283.    That Michigan's case-fatality rate is at 2.6% and higher than the national average should shock its leaders into focusing more on preventing deaths through better treatment methods and research instead of attempting to prevent disease transmission through scientifically questionable means.

284.    Thankfully, COVID-19 is not a deadly disease nor is it as contagious as other diseases.

285.    For reference, in 2009, the U.S. case-fatality rate for tuberculosis was about 4.6%, and tuberculosis transmission rates have been reduced without the use of mandated non-medical masks.

286.    The case-fatality rate for the 2017-2018 flu grew up to 10.8% according to CDC records, but non-medical masks were not mandated during that pandemic. The case-fatality rate for the 2008-2009 swine flu pandemic ranged from 1-10%—again non-medical masks were not mandated to reduce transmission. By doing the math based on the numbers given on the WHO website, seasonal flu has a worldwide case-fatality rate of 5.8%-21.7% even with a vaccine. Non-medical masks have never been mandated for seasonal flu and have not been mandated for pandemic flu in over 100 years. (Exhibit 38, 39)

287.    The case fatality rate for Ebola disease is about 50% and ranges from 25% to 90%, but when Ebola disease cases appeared in the United States, non-medical masks were not mandated—even for doctors returning home from Africa after being exposed to Ebola disease

firsthand. Prior to COVID-19, Dr. Fauci was adamant that droplet spread respiratory diseases were difficult to spread asymptomatically.

288.    The case-fatality rate for HIV in person-years (which are adjusted for time since HIV kills slowly) is currently 2% in the USA. (It technically has an 80-90% case-fatality rate, but most people die from complications of the disease.) HIV medications can cost up to $20,000 per month and HIV positive patients must be on them for decades. People with HIV are not mandated to wear condoms when having sex by any government agency worldwide. (Exhibits 40, 41)

289.    This disparate treatment lacks a real or substantial scientific relation to a need for a mask mandate intervention to control the spread of COVID-19, and the mandate is arbitrary in nature.

290.    The Plaintiff has a right to protection from arbitrary action of the government, *Administrative Procedure Act* § 706(2)(A).

291.    Substantive Due Process prevents the government from engaging in conduct that "shocks the conscious" or that interferes with the concept of ordered liberty. *Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952)

292.    Mandates issued by the Michigan State Department of Health and Human Services, to wear items regulated as apparel constitutes arbitrary, capricious, irrational and abusive conduct that interferes with Plaintiff's liberties protected by the due process clause of the U.S. Const., 14th Amendment.

293.    The actions of Governor Gretchen Whitmer and Robert Gordon use the authority of the State of Michigan to comply its citizens and visitors to the State to give up the freedoms afforded them by Federal law and the U.S. Constitution on little more than superstitious grounds.

294.    The actions of Governor Gretchen Whitmer, and Robert Gordon's actions shock the
conscience of the citizens of the United States by mandating apparel upon all citizens and
visitors to the State as if it were a regulated medical device with a proven track record for
stopping disease.

295.    The actions of Governor Gretchen Whitmer and Robert Gordon do not comport with the
traditional ideas of fair play and decency.

296.    Although Plaintiff is not a resident of Michigan, she has the right as a citizen of the
United States to pursue public activities in the State of Michigan and be free of governmental
interference.

297.    Randomly mandating apparel to be worn is causing citizens of Michigan and its visitors
to give up their freedoms and put their lives at risk—entrusting them to non-medical devices.

298.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein,
Plaintiff has suffered damages.

299.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein,
Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities
afforded under the law and seeks damages, reparations, declaratory relief, and injunctive relief to
prevent such further deprivation.

## (B): 42 U.S.C. § 1983- VIOLATIONS OF PROCEDURAL DUE PROCESS

300.    All previous paragraphs are incorporated herein.

301.    The U.S. Const., 14th Amendment forbids a state from depriving anyone of life, liberty,
or property without due process of law.

302.    None of the following due process protections have been afforded to Plaintiff as required
by the United States Constitution: a) No processes that permit evaluation by a neutral arbitrator;

48

b) No processes that provide for an opportunity to be heard; c) No processes that offer an opportunity to present witnesses; d) No processes that permit an opportunity to cross examine witnesses; e) No processes that allow for a reasoned decision; and, f) No processes that provide for an opportunity for an appeal.

303.    Mask mandates by Governor Gretchen Whitmer and Robert Gordon do not provide due process protections set forth herein. The Defendants' mask mandate policy on grounds of preventing disease transmission is contrary to the April 18, 2020 FDA EUA without any reasonable explanation or solid scientific evidence, constitutes an unexplained inconsistency and is arbitrary and capricious.

304.    Mask mandates by Governor Gretchen Whitmer and Robert Gordon deprive Plaintiff of fundamental rights without due process of law, based solely upon the discretion of Defendants, which discretion is not subject to appeal rights.

305.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered damages.

306.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges, and immunities afforded under the law and seeks damages, reparations, declaratory relief, and injunctive relief to prevent such further deprivation.

## (C) 42 U.S.C. § 1983, VIOLATIONS OF EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

307.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

308.    The Equal Protection Clause requires governments to act in a rational and non-arbitrary fashion.

309.   The Equal Protection Clause of the U.S. Const., 14th Amendment protects every citizen against intentional, arbitrary government discrimination, whether based on a policy's express terms or improper implementation by government agents.

310.   The Equal Protection Clause of the U.S. Const., 14th Amendment prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.

311.   Defendants deprived Plaintiff of her fundamental rights guaranteed under the United States Constitution and the ADA.

312.   Defendants' actions and/or omissions, as stated herein, constitute a violation of the Equal Protection as Plaintiff cannot access Michigan public or private businesses without putting her life at risk or being subject to harassment sanction by Robert Gordon through the MDHHS.

313.   Governor Gretchen Whitmer and Robert Gordon's actions in deciding to mandate non-medical masks, and then Robert Gordon's conflicting actions claiming to support the ADA in his Order while allowing posts on the Michigan Department that support businesses banning the disabled, like the YMCA did, in opposition to the ADA are arbitrary and irrational.

314.   Robert Gordon's actions mandating non-medical masks when many peer-reviewed scientific studies show non-medical masks do not reduce disease transmission and when a Rapid Review by the NAS published on April 9, 2020, concluded there is no evidence they would stop asymptomatic transmission, is not rational and is an arbitrary exercise of his power.

315.   Governor Gretchen Whitmer's and Robert Gordon's non-medical mask mandate is nothing more than arbitrary decision-making that relies on the speculations of Governor Gretchen Whitmer and Robert Gordon.

316.    Governor Gretchen Whitmer's and Robert Gordon's decision to mandate non-medical masks impedes Plaintiff's fundamental right to receive services and access public spaces equally with other non-disabled citizens without the government imposing arbitrary or irrational restrictions on that access.

317.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered injuries and damages.

318.    As a direct and proximate cause of Defendants' actions and/or omissions stated herein, Plaintiff has suffered a deprivation of her fundamental rights, privileges and immunities afforded under the law and seek damages, reparations, declaratory relief, and injunctive relief to prevent such further deprivation.

## COUNT VI: DECLARATORY JUDGEMENT

319.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

320.    Plaintiff is an interested party seeking declaration of her rights under the United States Constitution and the ADA as the non-medical mask mandates of Governor Gretchen Whitmer, Robert Gordon, and the actions of the YMCA in following these mandates instead of Federal Law have functioned to deprive Plaintiff of her fundamental rights and caused injuries and damages.

321.    Plaintiff seeks a declaratory judgment that Governor Gretchen Whitmer and Robert Gordon's non-medical mask mandates are in violation of the United States Constitution under: ARTICLE IV: §2 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several State"), AMENDMENT 1, AMENDMENT 4, AMENDMENT 5, and AMENDMENT 14.

322.    Plaintiff seeks a declaratory judgment that Governor Gretchen Whitmer and Robert Gordon's non-medical mask mandates are in violation of Plaintiff's right to equal protection of the law as guaranteed by the United States Constitution.

323.    Plaintiff seeks a declaratory judgment that Governor Gretchen Whitmer and Robert Gordon's non-medical mask mandates are in violation of Plaintiff's right to equal access as guaranteed by the ADA and 42 U.S.C. § 12101.

324.    In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary or proper prospective relief as justice may require.

## COUNT VII: REQUEST FOR INJUNCTIVE RELIEF

325.    Plaintiff incorporates all foregoing paragraphs, as if alleged herein in full.

326.    Plaintiff seeks a permanent injunction preventing the Governor Gretchen Whitmer and Robert Gordon and other health officers from mandating non-medical masks or facial coverings which violate Plaintiff's rights under the United States Constitution and Federal Laws as well as under the laws of the State of Michigan until such time as the FDA recognizes these items as medical devices, begins regulating them according to Federal Law, and large, significant, peer-reviewed, random-controlled-trials show these masks are effective at stopping disease transmission in comparison to wearing no mask.

327.    Plaintiff seeks a permanent injunction preventing Governor Gretchen Whitmer and Robert Gordon and other health officers from recommending non-medical masks for the prevention of disease unless a disclaimer is included as follows "These masks are not being evaluated by the FDA for effectiveness or safety and may cause serious health problems for some individuals" until such time as the FDA recognizes these items as medical devices and begins regulating them according to Federal Law.

328.    Plaintiff seeks a permanent injunction preventing the YMCA and other public and private businesses from preventing citizens who are not wearing non-medical masks from entering and using their facilities until such time as FDA recognizes these items as medical devices, begins regulating them according to Federal Law, and large, significant, peer-reviewed, random-controlled-trials show these masks are effective at stopping disease transmission in comparison to wearing no mask.

329.    Plaintiff seeks a permanent injunction preventing the YMCA and other private and public businesses from harassing citizens, including but not limited to arguing with them about whether or not they have a disability and or telling them in spite of that disability they should wear one, who are not wearing non-medical masks and who wish to use their facilities until such time as the FDA recognizes these items as medical devices, begins regulating them according to Federal Law, and large, significant, peer-reviewed, random-controlled-trials show these masks are effective at stopping disease transmission in comparison to wearing no mask..

330.    In the absence of the issuance of injunctive relief, Defendants will cause, and continue to cause, immediate and irreparable harm to Plaintiff including, but not limited to, loss of her First, Fourth, Fifth, and Fourteenth Amendment freedoms granted by the United States Constitution and losses to health due to the added stress put upon her from public ostracism and denial of business services.

331.    Public policy favors the entry of a permanent injunction because such relief will prevent unlawful conduct and will preserve and protect Plaintiff's health interests as well as the health interests of the citizens and visitors to the State of Michigan.

332.    The harm to the Plaintiff and similarly situated people who are subjected to Defendants'

discriminatory and unconstitutional recommendations and mandates herein substantially

outweighs any harm to the Defendants.

333.    Plaintiff will also seek temporary restraining orders and preliminary injunctions premised

on the basis asserted herein.

## VI.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against

Defendants jointly and severally as follows:

A. Declare that Defendants' actions as set forth herein were in violation of Federal Law deprived

Plaintiff of her rights, immunities, and privileges afforded thereunder;

B. Declare that Defendants' actions as set forth herein were in violation of the United States

Constitution and deprived Plaintiff of her rights, immunities, and privileges afforded thereunder;

C. Order this cause set for immediate hearing on Plaintiff's request for preliminary injunction,

and permanent injunction restraining and prohibiting Defendants from mandating people wear

non-medical masks which violates Plaintiff's rights under the United States Constitution and

Michigan Law;

D. Award Plaintiff her actual costs, damages, expenses, and reparations in the amount of

$100,000 split evenly between Governor Gretchen Whitmer and Robert Gordon and a free

unlimited lifetime family membership for Plaintiff and her family from the YMCA of Greater

Michiana.

E. Any and all other relief just and proper in the premises.


Respectfully submitted,

Jennifer Reinoehl
Pro Se Litigant

Jennifer Reinoehl, Pro se Litigant
51860 Cheryl Dr.
Granger, IN, 46530
574-302-6088
E-Mail: commercialsonly@juno.com

## Verification.

I, the undersigned, hereby swear or affirm, under penalties of perjury that the foregoing

statements are true.

**Jennifer Reinoehl**

**Dated**

Respectfully submitted,

**Jennifer Reinoehl,** Pro se Litigant
51860 Cheryl Dr.
Granger, IN, 46530
574-302-6088
E-Mail: commercialsonly@juno.com